USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-2-11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANGIE HICKMAN-SMITH o/b/o TAHIR WATKINS,

                                   Plaintiff,

                - against -

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                                 Defendant.

**REPORT AND RECOMMENDATION**

**07 Civ. 3985 (GBD) (RLE)**

**To the HONORABLE GEORGE B. DANIELS, U.S.D.J.:**

## I. INTRODUCTION

Plaintiff Angie Hickman-Smith brings this action under 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security (the "Commissioner"), finding that her son Tahir Watkins ("Tahir") was not eligible for Supplemental Security Income ("SSI") benefits. On December 3, 2008, the Commissioner filed for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Hickman-Smith cross-moved for a judgment on the pleadings, asking the Court to either reverse the decision of the Commissioner and find Tahir entitled to disability, or, in the alternative, to remand the matter to the Social Security Administration (the "SSA") for further proceedings. Hickman-Smith also requests an award of attorneys' fees. For the reasons set forth below, the Court recommends that the Commissioner's motion be **DENIED**, that Hickman-Smith's motion be **GRANTED**, that the case be **REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g), and that Hickman-Smith's request for attorneys' fees be **DENIED** without prejudice to renew if she receives a favorable decision on remand.

## II. BACKGROUND

### A. Procedural History

Hickman-Smith applied for benefits on behalf of Tahir on July 23, 2004. (A.R. at 67-69.)[1] She and Tahir appeared for a hearing before an Administrative Law Judge on May 4, 2006 (*Id.* at 15.), claiming that Tahir was eligible for disability benefits based on his marked expressive and receptive language deficits, his behavioral problems, and his bronchial asthma. (*Id.* at 335-36.) On August 23, 2006, the ALJ issued a decision finding Tahir was not disabled. (*Id.* at 15-24.) The decision became final when the Appeals Council denied Hickman-Smith's request for review on February 23, 2007. (*Id.* at 4-6.) This action followed when Hickman-Smith filed her Complaint on May 22, 2007.

### B. Factual Background

#### 1. Testimony at the ALJ Hearing

Tahir was born on June 20, 2002, and was almost four years old at the time of the hearing. (*Id.* at 67.) Hickman-Smith testified that Tahir had three siblings, and that he would often fight with them. (*Id.* at 337, 350.) She stated that Tahir had three to four tantrums a day (*Id.* at 341), during which he would throw himself to the ground and hit his head against the floor. (*Id.* at 352.) She told the ALJ that she was concerned about Tahir because he would stare at people for minutes without saying anything or responding to questions. (*Id.* at 349.) She also testified that Tahir was sleeping two to three hours a day before he was prescribed sleeping medication. (*Id.* at 354.) She ultimately took him to see a neurologist because his behavior was "out of control." (*Id.* at 348.) She also testified that she had taken Tahir to the emergency room

---

[1] "A.R." refers to the administrative record filed by the Commissioner.

four to five times for asthma related emergencies. (*Id.* at 358.) The ALJ attempted to interview Tahir at the hearing, but could not get him to speak at any length. (*Id.* at 15, 359-63.) Tahir told the ALJ that he was angry, and the ALJ eventually stopped questioning him. (*Id.*)

### 2. Medical Evidence

#### a. Cognitive Development

Dr. Jagdish Patel of the Montefiore Medical Center had treated Tahir since his birth. (*Id.* at 149-81) On November 24, 2003, when Tahir was seventeen months old, Dr. Patel noted that he was speaking only three words and was unable to learn new words and point to body parts. (*Id.* at 158.) One month later, Dr. Patel noted that Tahir had a history of anemia and a sleep disturbance. (*Id.* at 157.) On June 18, 2004, he recommended that Tahir receive speech therapy and enter an early intervention program to treat his speech problems. (*Id.* at 156.)

Other professionals subsequently evaluated Tahir's speech and language development. A social worker conducted a family assessment on June 30, 2004, and observed that Tahir had a small vocabulary for his age. (*Id.* at 113-14.) A "special educator," Thelma Perez-Salce, evaluated Tahir on July 1, 2004, and ultimately concluded that Tahir was functioning within normal limits in the areas of adaptive and motor development, but that he was "demonstrating delays in his personal-social, communication, and cognitive development." (*Id.* at 112.) A speech pathologist tested Tahir one week later, and noted that Tahir's expressive communication skills were significantly delayed. (*Id.* at 117-18.) On September 1, 2004, a state agency medical consultant evaluated Tahir's medical records, and opined that he had a marked limitation in the domain of acquiring and using information, and less than marked limitations in the domains of attending and completing tasks, interacting and relating with others, and caring for himself. (*Id.* at 128-29.) The medical consultant also observed that Tahir had no limitations in the domains of

3

"moving about and manipulating objects" and "health and physical well-being." (*Id.* at 127.)

On April 8, 2005, when Tahir was thirty-six months old, Dr. Jule A. Karp evaluated him for the purpose of assessing his level of functioning and determining his eligibility for special education services. (*Id.* at 135-38.) She noted that Tahir was attending an early intervention program, where he received special instruction and speech and language therapy. (*Id.* at 135.) Dr. Karp stated that Tahir was pleasant and cooperative, and exhibited good concentration and attention. (*Id.* at 135, 137.) Dr. Karp noted that Tahir liked to play with other children, and was not aggressive. (*Id.*) Tahir was functioning cognitively with a mental development index of 77, which Dr. Karp indicated was in the mildly delayed performance range and equivalent to a twenty-seven month developmental age. (*Id.* at 136, 138.) Dr. Karp indicated that Tahir's adaptive functioning was at the moderately low level and at a twenty-five month age equivalent, and that he had moderately low expressive and receptive language deficits. (*Id.*) Dr. Karp recommended preschool services to address the delays in Tahir's cognitive development, and a speech and language evaluation to determine his communication status. (*Id.* at 138.)

Dr. Don Brennan completed a preschool evaluation report of Tahir on April 28, 2005, and indicated that Tahir had a mild cognitive delay. (*Id.* at 144-47.) Hickman-Smith reported to Dr. Brennan that Tahir had frequent tantrums when he did not get his way. (*Id.* at 145.) Dr. Brennan noted that testing placed Tahir's expressive skills at the twenty-one month level, and his receptive skills at the twenty-eight month level. (*Id.*) In regard to his adaptive function functioning, Dr. Brennan stated that Tahir was not toilet trained, dressed and undressed with assistance, and was able to use a spoon and cup for feeding. (*Id.*)

On February 9, 2006, Dr. Maite La Vega-Talbott, a pediatric neurologist, evaluated Tahir. (*Id.* at 182-83.) Hickman-Smith informed Dr. La Vega-Talbott that Tahir was only

4

sleeping four hours per day, and that he did not take any naps. (*Id.*) She stated that Tahir would become aggressive when frustrated, and that he did not have many friends. (*Id.*) She also reported that Tahir had daily episodes of staring, which lasted a few minutes and during which he would become unresponsive. (*Id.*) A physical examination revealed no remarkable neurological findings. (*Id.*) Tahir's sleep patterns were monitored by EEG for two nights, and he was found only to sleep four to five hours each night. (*Id.* at 184-85.) A doctor reviewing the EEG monitoring concluded that it was "normal," and gave Tahir a trial prescription of clonidine. (*Id.*)

On April 11, 2006, Vladimir Grullon, a speech and language pathologist at the Herbert G. Birch Early Childhood Center, conducted a speech-language evaluation of Tahir, who was forty-five months old at the time. (*Id.* at. 191-93.) Language testing revealed Tahir's auditory comprehension was at an age equivalence of thirty-nine months or the 19th percentile, and his expressive communication was at an age equivalence of thirty-five months or the 13th percentile. (*Id.* at 192.) Grullon concluded that while formal testing indicated mild language delays, clinical observation indicated further delayed skills in this area. (*Id.* at 193.)

On May 12, 2006, Freddie Cummings, a group teacher at the Birch Center, completed an educational update for Tahir. (*Id.* at 188-90.) Cummings indicated that Tahir showed mild delays in social/emotional skills, fine motor development, and speech/language skills. (*Id.*) He also noted that Tahir had age-appropriate cognitive skills, self-help skills, and gross motor skills. (*Id.*) He reported that Tahir engaged in group activities, and was well-liked by his peers. (*Id.* at 188.) Cummings noted that Tahir was fully toilet trained and was able to complete his bathroom routine independently; eat breakfast and lunch using a fork and spoon; dress and undress without assistance; and speak in sentences to express his basic wants and needs. (*Id.* at 189.)

5

On September 27, 2006, after the ALJ's decision, Dr. La Vega-Talbott examined Tahir, and diagnosed him with receptive and expressive speech delays, along with hyperactivity and aggressive behavior. (*Id.* at 331.) She reported that Tahir was currently taking 0.5 mg of Tenex twice daily, and that Tahir was not falling asleep until 1:00 a.m. (*Id.*) She also indicated that Tahir's speech was better, and that there were no complaints from school where he attended a special class and speech therapy. (*Id.*) Dr. La Vega-Talbott increased his prescription of Tenex to 1 mg twice daily, and referred him to a psychologist for behavioral modification therapy. (*Id.*)

### b. Respiratory Problems

Tahir was taken to Weiler Hospital's emergency room three times in 2004 to treat coughs and wheezing. On July 30, 2004, his examining physician diagnosed him with tonsillitis and a streptococcus (strep) infection, and prescribed an antibiotic. (*Id.* at 306.) On November 28, 2004, Tahir went to the emergency room again with complaints of coughing, wheezing, and a fever, and Hickman-Smith informed the medical staff that he had been pulling on his left ear. (*Id.* at 287, 289.) His exam showed that he had asthma and an upper respiratory infection, and medication was prescribed. (*Id.* at 291, 297.) On December 21, 2004, Tahir again went to the emergency room with the same complaints, and a physical examination revealed impacted cerumen (wax) in both of his ears. (*Id.* at 276, 281.) The physician performed a procedure that removed a small amount of wax, and prescribed antibiotics to treat the cough and fever. (*Id.*) Two weeks later, Tahir was brought to the emergency room at Mount Vernon Hospital, where Hickman-Smith informed the staff that he was suffering from a fever and a cough. (*Id.* at 317-22.) The doctors diagnosed him with an undifferentiated respiratory disease, and medication was prescribed. (*Id.*) On February 16, 2005, Tahir was seen by a doctor for a follow-up appointment, and the doctor stated that he was "clinically better." (*Id.* at 322.)

### 3. The ALJ's Findings

The ALJ found that Tahir had the following severe impairments: receptive and expressive language delays; speech delays; and behavior problems. (*Id.* at 18.) The ALJ further found that Tahir's bronchial asthma, alleged sleep impairments and neurological problems were not well documented and did not qualify as severe impairments because they did not affect Tahir's physical and mental abilities. (*Id.*) The ALJ concluded that Tahir had a marked limitation in "acquiring and using information;" had a less than marked limitation in "attending and completing tasks" and "interacting and relating with others;" and had no limitation in "moving about and manipulating objects, " "caring for himself," and "health and physical well-being." (*Id.* at 19-23.) Because Tahir did not have an impairment or combination of impairments that resulted in either "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, the ALJ concluded that Tahir had not been disabled within the meaning of the Social Security Act since July 23, 2004, the date the application was filed. (*Id.* at 24.)

### 4. Appeal Council Review

Hickman-Smith appealed the ALJ's decision to the Appeals Council on October 27, 2006, claiming (1) that the ALJ's decision was infected by gross inconsistencies and irrelevant observations that suggested bias against Tahir and Hickman-Smith, and (2) that the ALJ ignored substantial evidence that Tahir was markedly limited in his ability to interact with and relate to others. (*Id.* at 9-10.) Hickman-Smith submitted additional evidence showing that Tahir was on strong medication to control his behavior, and that he saw a neurologist every three months. (*Id.* at 8.) The Appeals Council denied Hickman-Smith's request for review on February 23, 2007. (*Id.* at 4.)

## III. DISCUSSION

**A. Standard of Review**

A reviewing court does not determine *de novo* whether a claimant is disabled. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984)). Rather, the court's inquiry is limited to the question of whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such determination is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citing *Cruz v. Sullivan*, 912 F.2d 983, 986 (2d Cir. 1990)). When a reviewing court concludes that the SSA applied the incorrect legal standard, a court may remand the matter to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record or to explain his reasoning. *See Martin v. Astrue*, No. 07 Civ. 3911, 2009 WL 2356118, at *6 (S.D.N.Y. July 30, 2009) (internal citations omitted).

If the Court determines that the correct legal standard has been applied, and the Commissioner's decision is supported by substantial evidence, the reviewing court shall deem the Commissioner's findings of fact conclusive and affirm the decision. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citations omitted). Substantial evidence in this context is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. "[T]o determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire administrative record, including contradictory evidence and evidence from which conflicting inferences could be drawn." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per

curiam)). New evidence that is submitted to the Appeals Council after the ALJ's decision becomes part of the administrative record for judicial review when the Appellate Council denies review of the ALJ's decision, provided the evidence is new and material and relates to the period before the ALJ's decision. *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996).

**B. Evaluation of Disability Claims**

The Commissioner follows a three-step process established by the SSA to determine whether a child under the age of eighteen is disabled and should receive SSI benefits. 20 C.F.R. § 416.924(a). The ALJ must determine (1) whether the child is engaged in substantial gainful activity, (2) whether the child suffers from a medically determinable "severe" impairment, and (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals a disability listing promulgated by the SSA. 20 C.F.R. § 416.924(b)-(d). If the ALJ finds that the child's impairment meets these criteria, and that the impairment has lasted or expected to last for a continuous period of at least twelve months, the child is presumed disabled. 20 C.F.R. 416.924(d). The ALJ uses criteria enumerated in Appendix 1 of C.F.R. part 404, subpart P, to analyze an alleged disability.

The ALJ will find that a child's impairment meets a listing in Appendix 1 when it "satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement." 20 C.F.R. § 416.925(c)(3). The ALJ will find that a child's impairment medically equals a listing if it does not exactly match, but "is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). To determine whether a child's impairment functionally equals a listing, the ALJ evaluates the child's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving and manipulating objects;

9

(5) caring for himself; and (6) health and physical-well being. 20 C.F.R. § 416.926a(b)(1). The Commissioner compares the child's performance in each of these domains to the performance of other children the same age who do not have impairments. 20 C.F.R. § 416.926a(b)(2). A child's impairment functionally equals a listing if the child shows a "marked" limitation in any two of the six domains, or an "extreme" limitation in one of the six domains. 20 C.F.R. § 416.926a(d).

A child has a "marked" limitation when his impairment seriously interferes with his ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation is also defined as: (1) "more than moderate" and "less than extreme"; and (2) a valid score that is two or more standard deviations below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, provided that the child's day-to-day functioning in domain related activities is consistent with that score. 20 C.F.R. § 416.926a(e)(2).

A child has an "extreme" limitation in any one domain when his impairment "very seriously" interferes with his ability to independently initiation, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation would also be found in a domain where a child scores at least three standard deviations below average. 20 C.F.R. § 416.926a(e)(3)(I).

To determine whether a claimant for SSI benefits is disabled, the ALJ must find that the child's impairment satisfied the three-step test and the twelve-month duration requirement at any time after the date of filing the application for SSI, but before the date of the ALJ's decision. *See* 20 C.F.R. § 416.330.

## C. Issues on Appeal

Hickman-Smith advances two arguments to support her position that the Commissioner's decision should be reversed. First, she argues that the ALJ made a factual and legal error when

he found that her testimony was not credible. (Pl.'s Mem. of Law ("Pl.'s Mem.") at 15.) Second, she argues that the ALJ erred by finding that Tahir's sleep and asthma problems were not severe. (*Id.* at 20.) The Commissioner argues that the ALJ properly evaluated Tahir's claim pursuant to the three-step process set forth in 20 C.F.R. § 416.924, and that the ALJ's finding that Tahir did not qualify as disabled was supported by substantial evidence. (Def.'s Mem. of Law ("Def.'s Mem.") at 15.)

### 1. The ALJ's Credibility Determination

As a factfinder, the ALJ is free to accept or reject the testimony of a claimant's parent. *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988). A finding that a witness is not credible, however, must be set forth with sufficient specificity "to permit intelligible plenary review of the record." *Id.* (citing *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983). "If the child claimant is unable to adequately describe his symptoms, the ALJ must accept the description provided by testimony of the person most familiar with the child's condition, such as a parent." *Hickman ex rel. M.A.H. v. Astrue*, 728 F. Supp. 2d 168, 181 (N.D.N.Y. 2010) (citing *Jefferson v. Barnhart*, 64 Fed. Appx. 136, 140 (10th Cir. 2003)); *see also* Social Security Ruling 96-7p, 1996 WL 374186, fn 2 (S.S.A.). "In such a case, the ALJ must make specific findings concerning the credibility of the parent's testimony, just as he would if the child were testifying." *Hickman ex rel. M.A.H.*, 728 F. Supp. 2d at 181.

The Commissioner has established a two-step process to evaluate a claimant's testimony regarding his symptoms:

> First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to produce pain or symptoms alleged by the claimant. Second, if the ALJ determines that the claimant is impaired, he then must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms. If the claimant's statements about his symptoms are not substantiated by

11

objective medical evidence, the ALJ must make a finding as to the claimant's credibility.

*Matejka v. Barnhart*, 386 F. Supp. 2d 198, 205 (W.D.N.Y. 2005) (citing *Murphy v. Barnhart*, No. 00 Civ. 9621, 2003 WL 470572, at *10-11 (S.D.N.Y. Jan. 21, 2003); 20 C.F.R. § 404.1529(c)). "At the first step in the credibility analysis, 'plaintiff's allegations *need not be substantiated by medical evidence, but simply consistent with it.* The entire purpose of section [ ] 404.1529 . . . is to provide a means for claimants to offer proof that is not wholly demonstrable by medical evidence." *Hogan v. Astrue*, 491 F. Supp. 2d 347, 353 (W.D.N.Y. 2007) (emphasis in the original) (internal citations omitted); *see also* 20 C.F.R. § 404.1529(c) ("Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions . . ., which can be reasonably accepted as consistent with the objective medical evidence and other evidence, will be taken into account.") "Only allegations beyond what is substantiated by medical evidence are subjected to a credibility analysis. To require plaintiff to fully substantiate [his] symptoms would be both an abrogation of the regulations and against their stated purpose." *Hogan*, 491 F. Supp. 2d at 353 (citing *Castillo v. Apfel*, No. 98 Civ. 0792, 1999 WL 147748, at *7 (S.D.N.Y. Mar. 18, 1999).

As an initial matter, the Court finds that Tahir was unable to adequately state his symptoms at the hearing. He did not respond to a number of the ALJ's questions, and gave brief one word answers to the questions he did answer. The ALJ noted that it was "difficult to communicate" with Tahir, and ultimately gave up questioning him. (A.R. at 364.) As a result, the Court finds that the ALJ was required to accept Hickman-Smith's testimony about Tahir's symptoms or explain why he did not find her testimony credible.

It is clear from the ALJ's decision that the he determined that Hickman-Smith's

testimony was not credible because he did not refer to it when evaluating Tahir's functioning in the various domains. Notably, the ALJ did not consider Hickman-Smith's testimony about Tahir's behavioral problems when he concluded that Tahir had a "less than marked limitation" in the domain of interacting and relating with others. (*Id.* at 22.) Hickman-Smith's testimony regarding Tahir's temper tantrums and fights with his siblings clearly was relevant to this inquiry, and was contrary to the ALJ's finding that Tahir's socialization had not been delayed by his speech and language delays. (*Id.*) The weight the ALJ gave to Hickman-Smith's testimony is significant because he ultimately found that Tahir had a "marked limitation" in his ability to acquire and use information, and a finding that Tahir also had a "marked limitation" rather than a "less than marked limitation" in his ability to interact with others would have made Tahir functionally disabled under the Act.

The ALJ never made a formal finding regarding Hickman-Smith's credibility, although he discredited her testimony in a footnote on the first page of his decision. In the footnote, the ALJ stated that her statement that Tahir would hit his head against the floor when he was upset was "not believable," because, if it were true, Tahir "would be knocking himself unconscious." (*Id.* at 15.) Based on his personal observations of Tahir and the reports of teachers from his school, the ALJ noted that Tahir appeared "reasonably well-behaved," which he indicated was inconsistent with Hickman-Smith's testimony that Tahir would have four to five tantrums a day. (*Id.*) The ALJ also stated that other than Hickman-Smith's testimony, there was nothing in the medical records to support her claims about Tahir's staring spells, his asthma, or his sleeping

13

problems.[2] (*Id.*)

The Court finds that it cannot determine whether the ALJ's assessment of Hickman-Smith's credibility was in accordance with the Commissioner's regulations because the ALJ failed to make a formal finding as to her credibility. Although it is apparent that the ALJ concluded that Hickman-Smith was not credible, it is unclear whether he determined at the first step of his credibility determination that Tahir's impairments could not reasonably be expected to produce the tantrums and other behavior Hickman-Smith identified, or whether he determined at the second step that Hickman-Smith's allegations regarding the intensity, persistence, and limiting effects of Tahir's symptoms were inconsistent with the medical evidence. Accordingly, the Court cannot evaluate whether his apparent determination that Hickman-Smith was not credible was supported by substantial evidence. Therefore, on remand, the ALJ must clarify the basis of his credibility determination regarding Hickman-Smith's testimony in accordance with the two-step process outlined in Social Security Ruling 96-7p and 20 C.F.R. § 404.1529.

## 2. The ALJ's Determination Regarding Tahir's Sleep and Asthma Problems

The ALJ concluded that Tahir's purported sleep and asthma problems were not severe under the regulations because they were not well-documented, and they did not appear to affect his physical and mental capabilities. (A.R. at 18.) Hickman-Smith contends that the ALJ erred in making this determination because he did not consider a report by a speech therapist that indicated that Tahir had significant language delays. (Pl.'s Mem. at 20.) Hickman-Smith

---

[2] The Court notes that it appears the ALJ did not properly credit Hickman-Smith's earlier statements about Tahir's condition. Hickman-Smith raised concerns regarding Tahir's tantrums, sleeping problems, and staring spells with medical professionals prior to the hearing, and her comments are reflected in the medical records. (*See* Tr. 157, 115–16, 182, 184) Under the regulations, "the consistency of individual's own statements is one strong indication of credibility, especially those complaints that are made to treating or examining medical sources." *See Cloutier v. Apfel*, 70 F. Supp. 2d 271, 278 (W.D.N.Y. 1999) (citing Social Security Ruling 96-7p, 1996 WL 374186, *4-5 (S.S.A.).

additionally argues that Tahir's sleep and asthma problems were well-documented by the medical records. (*Id.* at 20-21.)

The Court finds that it cannot determine whether the ALJ's decision regarding the severity of Tahir's sleep and asthma problems was supported by substantial evidence because the record does not permit the Court to evaluate the ALJ's assessment of Hickman-Smith's credibility. Hickman-Smith testified about Tahir's sleep and asthma problems, and, prior to the hearing, she had repeatedly informed medical professionals about such problems. (*See* A.R. at 157, 115–16, 182, 184.) Moreover, medical testing appears to confirm some of Hickman-Smith's statements, reflecting that Tahir only slept for four to five hours a night, that he was recommended clonidine for his sleep, and that he had asthma. (*Id.* at 182-184, 297.) Accordingly, on remand, the ALJ should clarify the basis of his credibility determination of Hickman-Smith, and then reevaluate whether the evidence supports a finding that Tahir's sleep and asthma problems were severe.

## D. Attorneys' Fees

Hickman-Smith requests an award of attorneys' fees pursuant to the Equal Access of Justice Act ("EAJA"), 28 U.S.C. § 2412(d), on the grounds that the Commissioner's action in this case was not substantially justified. The EAJA provides in relevant part that "a court shall award to a prevailing party . . . fees and other expenses . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make the award unjust. 28 U.S.C. § 2412(d)(1)(A). Here, the Court is recommending that the case be remanded to the Commissioner, and Hickman-Smith is not a prevailing party potentially entitled to fees pursuant to the EAJA. Therefore, the Court recommends that Hickman-Smith's request for attorneys's be denied without prejudice to renew if she receives a favorable decision on

15

remand.

## IV. CONCLUSION

For the foregoing reasons, the Court recommends that the Commissioner's motion for judgement on the pleadings be **DENIED**, and that Hickman-Smith's motion for judgment on the pleadings be **GRANTED**, that Hickman-Smith's motion for attorneys' fees be **DENIED** without prejudice to renew, and that the case be **REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) to clarify the basis for his credibility analysis and set forth his findings in accordance with the two-step process of Social Security Ruling 96-7p and 20 C.F.R. § 404.1529.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable George B. Daniels, 500 Pearl Street, Room 630, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections in both the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(d).

**SO ORDERED this 1st of March 2011**
**New York, New York**

*/s/ Ronald L. Ellis*

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

Copies of this Report and Recommendation were sent to:
Plaintiff's counsel:
Rannylin Stephanie Dalley
1916 Park Avenue, Suite 624
New York, NY 10038

Defendant's attorney:
John E. Gura, Jr.
U.S. Attorney's Office
86 Chambers Street
New York, NY 10007